## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In Re: | CASE NO.  22-57594-LRC |
| **3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC,** | CHAPTER 11 |
| Debtor. | |

## DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION PROPOSED BY DEBTOR 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC

## I.  INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") has been prepared pursuant to Section 1125 of the United States Bankruptcy Code on behalf of 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC (the "**Debtor**") in connection with the Debtor's solicitation of votes for its Plan of Reorganization dated December 22, 2022 [Doc. 75] (the "**Plan**"). It contains important information about the Debtor and the Plan.[1]

In providing this Disclosure Statement to parties in interest, the Debtor expressly seeks to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Disclosure Statement contains a summary of the Plan, general information about the Debtor and its Chapter 11 case, and important information concerning the Debtor's current financial condition and future prospects.

The information contained herein has been prepared by the Debtor in good faith, based upon information available to the Debtor.  The financial information contained herein all financial information was compiled from the records of the Debtor but has not been verified by an audit.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which has been filed contemporaneously herewith.  Each creditor is encouraged to read, consider, and carefully analyze the terms and provisions of the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or equity interests.

## II.  BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE

Under Chapter 11 of the Bankruptcy Code a debtor is afforded an opportunity to rehabilitate its business and to restructure its financial obligations to its creditors.  In some instances, a debtor may also change the structure of its equity securities by canceling one or more classes of equity securities or issuing new securities.

In general, a debtor files a "Chapter 11 Plan," which sets forth a proposal for settlement of the debtor's debts.  A debtor's debts are classified as either being secured or unsecured, depending on whether the debtor has pledged any of its property to the creditor as collateral for the debt.

A debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments. A debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

The Bankruptcy Code requires that certain unsecured debts receive priority in payment over other debts.  Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11 case, certain wages and employee benefits, certain consumer obligations, and taxes.

The Bankruptcy Code requires that a plan propose full cash payment to all priority unsecured creditors except taxing authorities.  Taxes under the Bankruptcy Code may be paid over time in installments.  Unsecured creditors may receive payments of anywhere from 0% to 100% of their claims, in a lump sum or over time, and the percentage and timing of payments depends on many factors and varies widely from case to case.

In any event, unless the creditors agree differently, a plan must provide creditors with at least the same treatment that creditors would receive in a liquidation of the debtor's assets under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Code requires that the debtor (or other plan proponent) file a plan with the Court, which be accompanied by a disclosure statement.  The disclosure statement must contain a summary of the plan and sufficient information about the debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or against the plan.

After the plan and disclosure statement are filed, the Court may hold a hearing on the adequacy of the disclosure statement or, in a small business case, may conditionally approve the disclosure statement, with final approval to be heard at the same time as confirmation of the plan. If the Court determines that the disclosure statement makes proper disclosures, then it is approved

(or conditionally approved as the case may be), and the plan and disclosure statement, along with a ballot, are mailed to creditors and equity security holders for voting.

Typically, a date is set by the Court as the last day votes may be counted.  The Court also schedules a confirmation hearing, at which time the Court hears evidence as to whether the plan complies with various standards for confirmation under the Bankruptcy Code, including whether sufficient votes have been cast accepting the plan from classes of creditors whose rights have been "impaired" by the plan (*i.e.*, creditors not receiving precisely the same rights they were entitled under their contracts with the debtor). Only ballots that are properly submitted are counted, so if a creditor does not vote, they are simply not counted in either the acceptance or rejection tallies.

There are two ways that a plan may be confirmed by the Court.  First, the plan may be confirmed if all the impaired classes vote to accept the plan, with a simple majority in number of creditors in the impaired class voting to accept, but they must also hold claims totaling at least 2/3 of the value of all of the claims in that class that voted.

Alternatively, if a class of impaired creditors does not accept the plan, then the plan may still be confirmed if it is "fair and equitable" respecting such class.  The Bankruptcy Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any compensation under the plan.  Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim.  When a Court confirms a plan notwithstanding the lack of acceptance of all impaired classes, it is said that the debtor has achieved a "cramdown" of the plan.

When a debtor's plan is confirmed, the debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding and applies even to creditors who voted against the plan.

## III.  BACKGROUND CONCERNING THE DEBTOR

### A.    Pre-bankruptcy History of the Debtor

The Debtor is a Georgia-based company that owns a commercial rental property located at 3333 Old Milton Parkway, Alpharetta, Georgia 30005 (the "**Property**" and the "**Business**"). The Property is a medical office building. 3333 Alpharetta Lifehope MOB 1 JV, LLC (the "**Sole Member**") is the Sole Member and Manager of the Debtor. 3333 Alpharetta Lifehope HPE, LLC is the Manager of the Sole Member (the "**Sole Member's Manager**"). Scott Honan is the Manager of the Sole Member's Manager.

Mr. Honan has over 22 years of experience successfully managing medical office buildings in metro Atlanta, Texas, Florida, and Tennessee. Unfortunately, the Covid-19 pandemic was particularly hard on medical office landlords as all non-essential medical services were halted. The Debtor's tenants fell behind on rent during the pandemic. Further complicating matters, in 2021 Mr. Honan was hospitalized for months with a severe case of Covid-19.

Due to these factors, the Debtor fell behind on debt service payments. The Debtor's primary secured creditor, Capital One, National Association ("**Capital One**") scheduled the Property for an October 2022 foreclosure sale. In order to stop the sale and preserve the value of the Property, the Debtor was forced to file for chapter 11 protection.

**B.      Summary of Activities in the Debtor's Chapter 11 Case**

On, September 23, 2022 (the "**Petition Date**"), the Debtor filed a petition under Chapter 11 of the Bankruptcy Code, commencing this bankruptcy case. The case is pending before the Honorable Lisa Ritchey-Craig, Judge for the United States Bankruptcy Court, Northern District of Georgia (the "**Court**").  The Debtor has continued in possession of its assets, and no trustee has been appointed in the case.

The Debtor has worked diligently since the Petition Date to comply with all of the requirements of being a Debtor in Possession as well as to satisfy the requests of its creditors that have been involved in the case, including Capital One. To this end, the Debtor has provided Capital One with responses to informal discovery requests and Mr. Honan sat for a deposition taken by Capital One. The Debtor has worked out four interim consent orders with Capital One on its request to use cash collateral [Doc Nos. 17, 48, 59, and 66].

Over the course of this case, the Debtor has also continued to run the Business and has diligently pursued either a refinance or sale of the Property. The Debtor has now secured a Purchase and Sale Agreement for the Property for $39,500,000.00, which will allow the Debtor to pay its creditors in full and emerge from bankruptcy successfully. The sale is discussed in detail in Section VII of the Disclosure Statement below.

## IV.   SUMMARY OF THE PLAN

The plan provides for the payment in full of all secured, priority, and general unsecured claims (except for the claims of the Honan Entities) and retention of equity interests in the Debtor as set forth below:

**A.      Priority Claims**

The Plan provides for the satisfaction of all allowed administrative claims on the Effective Date, unless otherwise agreed by the holder of such claim. As to each administrative claim allowed thereafter, payment will be made as soon as practicable.  The Plan also provides for the satisfaction of all priority tax indebtedness on the Effective Date.

**B.      Claim of Capital One**

Capital One holds a lien on virtually all of the Debtors' assets. Capital One filed proof of claim 4-1 in the amount of $31,085,028.82. The Debtor proposes to pay the payoff as of the Effective Date to Capital One in full on the Effective Date.

### C.    Claim of Phoenix

Phoenix Elevator Service Inc. of GA. ("**Phoenix**") is a secured creditor by virtue of a Materialman's and Mechanic's Lien. The Debtor believes the total current amount of Phoenix's claim is $4,532.00. The Debtor proposes to pay the secured claim of Phoenix with post-petition interest in full on the Effective Date.

### D.    General Unsecured Creditors

The Debtor estimates, based on its schedules and proofs of claims that have been filed, that there will be approximately $126,238.77 in allowed general unsecured claims, excluding the Honan Entities. The Debtor proposes to pay General Unsecured Claims with post-petition interest in full on the Effective Date. See **Exhibit A** hereto for the Debtor's estimate of general unsecured claims.

### E.    The Honan Entities

On its amended Schedule F [Doc. 52], the Debtor listed unsecured debts owed to Honan Preferred Equity and Honan Property Management, both of which are controlled by Mr. Honan. While the Debtor does not believe that these entities meet the statutory definition of insiders, the Debtor is excluding these claims from Class 3 General Unsecured Claims and the Honan Entities are waiving any claims they have against the Debtor.

### F.    Equity Interests

The Reorganized Debtor shall not make any distributions or pay any dividends related to any Equity Interests unless and until all distributions related to all Allowed Claims in Classes 1-3 have been made in full as set forth herein.

### G.    Valuation of Assets and Collateral

Mr. Honan provided values for the Debtor's assets based on his experience in the industry as of the filing of the Plan and Disclosure Statement. The Debtor has not conducted an auction with respect to its assets because the Debtor believes such a process and the administrative and transactional costs related thereto would cause its estate to incur significant additional costs without a corresponding benefit to creditors. The Debtor believes that the amounts which will be generated by the Debtor's ongoing business are greater than the net proceeds that would be obtained through any such auction. Accordingly, the Debtor submits that the asset values indicated herein and hereto represent the fair market value of those assets, subject to any further determination of such value by the Court at or prior to the hearing on confirmation of the Plan.

### H.    Funding for the Plan

The cash distributions contemplated by the Plan shall be funded by cash generated from the sale of the Property.

## I.    Absolute Priority Rule and New Value Exception

Under section 1129 of the Bankruptcy Code, plans must be "fair and equitable" in order to be confirmed. Section 1129(b)(2)(B)(ii) provides guidance as to what constitutes "fair and equitable." It includes a requirement that junior classes of creditors and equity holders cannot receive property of a debtor during a reorganization, unless all senior classes either are paid in full or vote to accept the plan. This requirement is commonly referred to as the absolute priority rule.

The "new value" doctrine is a common law exception to the absolute priority rule. The basic concept behind "new value" is that equity holders may retain their interest in a debtor when they provide contribution, often in the form of capital, to the reorganization. Generally speaking, for the "new value" exception to apply, the value provided must be substantial, necessary, and reasonably equivalent to the value of the interest received in exchange.

As set forth in the Plan and herein, because all creditors will be paid in full under the Plan, the Debtors do not believe that the absolute priority rule is applicable.

## J.    Cramdown

The Plan does not impair any class of creditor and therefore all classes of creditors are deemed to accept the Plan. However, if the Plan were to be amended to impair any class, the Debtor would be requesting confirmation pursuant to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that votes to reject the Plan. Accordingly, upon confirmation by the Bankruptcy Court, the Plan will be binding on all creditors and Classes, even if they voted to reject the Plan.

## K.    Other Plan Provisions

Any executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed assumed and assigned to the Purchaser on the date of closing of the Sale. Specifically, the Ground Lease with the Ground Lessor will be assumed and assigned to the Purchaser on the date of closing of the Sale. All cure costs, including the September 2022 ground lease payment and any other cure costs owed to the Ground Lessor, shall be made at the time of the closing of the Sale.

**THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH HAS BEEN FILED CONTEMPORANEOUSLY HEREWITH.**

## V.    VOTING ON THE PLAN

Below is a summary of the Classes set forth in the plan and identification of which Classes are entitled to accept or reject the Plan:

- **Class 1 (Secured Claim of Capital One)** is Unimpaired and deemed to accept the Plan.

- **Class 2 (Secured Claim of Phoenix)** is Unimpaired and deemed to accept the Plan.

- Class 3 (**General Unsecured Claims**) is Unimpaired and deemed to accept the Plan.

- Class 4 (**Equity Interests**) is Unimpaired and deemed to accept the Plan.

## VI. DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditors hold liens. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of the Debtor's estate, including the costs resulting from a Chapter 7 liquidation, and the adverse effect of a forced sale on the price of the Debtor's assets, the Debtor has determined that confirmation of the Plan will provide each holder of a claim with a recovery that substantially more than each such holder would receive in a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code.

The Debtor's schedules show that in addition to the Property, its only other assets are a minimal amount of cash on the bank and $38,612.69 of collectible accounts receivable. The Debtor valued the Property at $56,000,000.00 in its schedules. This value was based on a fully occupied building. At present the building is only 70% occupied and the Debtor believes that its true value is $39,500,000.00.

The Debtor has a contract to sell the Property for $39,500,000.00, which will pay its creditors in full. Creditors will receive the same as they would receive under a Chapter 7 liquidation and are to be paid in full either on the Effective Date or within 30 days of the Effective Date. In a Chapter 7, creditors would not be paid in as expeditious a manner. The Debtor believes that this satisfies the Best Interests Test.

## VII.  SALE OF THE PROPERTY

The Property's tenants have formed a special purpose entity called 3333 Physicians Center MOB 1 SPE, LLC (the "**Purchaser**") in order to purchase the Property. The Purchaser has secured a Term Sheet Loan Commitment letter from Alpha Finance Corp. The Purchaser will pay $39,500,000.00 cash at closing and the closing is anticipated to occur within 90 days of the date that the contract is executed. The Debtor has attached to this Disclosure Statement as **Exhibit B** the Purchase and Sale Agreement.

## VIII. ANALYSIS OF CLAIMS AND APPROXIMATE DISTRIBUTIONS TO CREDITORS UNDER THE PLAN

### A.    Projected Administrative Claims

The Debtor provides the following as an estimate of administrative expenses to be incurred in connection with confirmation of the Plan and closing of the bankruptcy estate:

| | | |
|---|---|---|
| Bankruptcy Counsel fees and expenses | $ | 60,000.00 |
| US Trustee's Fees | $ | 260,000.00 |
| Total administrative expenses incurred in connection with confirmation and closing | $ | **320,000.00** |

### B.    Projected Priority Claims

As of the date of this Disclosure Statement, the Debtor does not believe that any priority tax claims, nor any non-tax priority claims exist.

## IX.  LITIGATION; BANKRUPTCY CAUSES OF ACTION; AND RECOVERY OF ASSETS

The Debtor knows of no litigation which will be instituted and/or continued against any party following confirmation of the Plan, except for routine claim objections which may be instituted against claimants whose claims may be disputed by the Debtor.

## X.  INFORMATION RELEVANT TO THE RISKS POSED TO CREDITORS UNDER THE PLAN

The primary risk to creditors in this case is that the sale of the Property will not close. However, the Debtor believes that this is a minimal risk. The purchaser is the entity formed by the tenants, who are very motivated to secure the future of the Property. The tenants' financing has already been pre-approved.  Although it is impossible to predict any unforeseen contingencies, the Debtor anticipates the closing of the sale and payment to creditors within the timeframe contemplated in the Plan.

## XI.  FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

The Debtor is not aware of any adverse federal or state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against the Debtor as a bad debt.

**However, the Debtor does not warrant that there will be no tax implications to creditors resulting from confirmation of the Plan, and creditors should not rely on the Debtor's representations regarding potential tax consequences. Creditors are well-advised to consult their tax advisors as to whether confirmation of the Plan could cause any adverse tax implications.**

The U.S. federal income tax consequences to a holder of a Claim (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (a) the manner in which you acquired a Claim; (b) the length of time that you have held the Claim; (c) whether you acquired the Claim at a discount; (d) whether you have taken a bad debt deduction with respect to the Claim (or any portion thereof) in current or prior years; (e) whether you have previously included in taxable income accrued but unpaid interest with respect to the Claim; and (f) your method of accounting.

## XII.  <u>DISCLAIMER</u>

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY OTHER SECURITIES REGULATORY AUTHORITY NOR HAS THE SEC OR ANY OTHER SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS OR EQUITY INTERESTS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN

THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTOR AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTOR. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY THE DEBTOR, ITS ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTOR WILL NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A

RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SEC OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, SHOULD BE READ IN ITS ENTIRETY. ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.

NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITIONS, OR THE VALUE OF ITS PROPERTY ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.

## XIII. CONCLUSION

The Debtor submits that the Plan provides for an orderly and expeditious payment of all of its indebtedness to creditors. The Debtor further submits that the alternative of a Chapter 7 liquidation does not appear to be a viable method of maximizing recovery to creditors in this case, in that the added expense of administering a Chapter 7 and the fire-sale nature of Chapter 7 would decrease the amount that general unsecured creditors would receive in a Chapter 7 setting (if anything).

In the opinion of the Debtor, the Plan is the best available option for creditors because it will provide general unsecured creditors with total payments the that in sum are estimated to be double or triple what creditors would likely receive in a Chapter 7 liquidation.

Dated: December 22, 2022             **ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Elizabeth Childers*

William A. Rountree, Ga. Bar No. 616503
Will Geer, Ga. Bar No. 940493
Benjamin R. Keck, Ga. Bar No. 943504
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
wrountree@rlklglaw.com
wgeer@rlklglaw.com
echilders@rlkglaw.com
*Attorneys for the Debtor*

**EXHIBIT A**

**Anticipated Unsecured Claims**

| Name | Estimated Claim Amount | Claim No. | Amount of Claim | Amount for Plan |
|---|---|---|---|---|
| Exmoor LLC | $ 2,300.00 | | N/A | $ 2,300.00 |
| Lynne Klein | $ 114.05 | | N/A | $ 114.05 |
| Superior Water Services Inc | $ 882.70 | 2-1 | $ 545.00 | $ 545.00 |
| Chief Fire Protection Company, Inc. | $ 1,008.00 | | N/A | $ 1,008.00 |
| McCain Power Solutions, LLC | $ 325.00 | | N/A | $ 325.00 |
| Dormakaba USA, Inc. | $ 206.59 | | N/A | $ 206.59 |
| A and S Lock and Safe | $ 305.25 | | N/A | $ 305.25 |
| Brightside IT Solutions | $ 4,626.25 | | N/A | $ 4,626.25 |
| First Link, LLC | $ 600.00 | | N/A | $ 600.00 |
| TefftNet, Inc. / IMPAK | $ 391.40 | | N/A | $ 391.40 |
| Integra Realty Resources | $ 500.00 | | N/A | $ 500.00 |
| Lanier Extermination Service, Inc. | $ 200.00 | | N/A | $ 200.00 |
| Pepper's Backflow Services | $ 150.00 | | N/A | $ 150.00 |
| Dogwood Facilities Services LLC | $ 8,928.38 | | N/A | $ 8,928.38 |
| Chief Electric, LLC - Station 5 | $ 525.00 | 1-1 | $ 1,440.00 | $ 1,440.00 |
| Ecolab, Inc. | $ 429.69 | | N/A | $ 429.69 |
| Serv'All Plumbing & Rooter Services | $ 1,526.00 | | N/A | $ 1,526.00 |
| Southern Inspection Group Inc. | $ 570.00 | | N/A | $ 570.00 |
| United Fire Protection, Inc | $ 6,030.00 | | N/A | $ 6,030.00 |
| Brucker HVAC, LLC | $ 6,740.00 | | N/A | $ 6,740.00 |
| Genesis Elevator Company, Inc. | $ 60,000.00 | | N/A | $ 60,000.00 |
| Eastern Waterpoofing and Coating, LLC | N/A | 3-1 | $ 29,303.16 | $ 29,303.16 |
| | | | **TOTAL** | **$ 126,238.77** |

**EXHIBIT B**

**Purchase and Sale Agreement**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made and entered into as of December 16th , 2022, by and among (i) **3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC,** a Georgia limited liability company (hereinafter referred to as "**Seller**"), (ii) **3333 PHYSICIANS CENTER MOB 1 SPE, LLC** a Georgia limited liability company (hereinafter referred to as "**Purchaser**").

### W I T N E S S E T H :

FOR AND IN CONSIDERATION of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, the receipt and sufficiency whereof are hereby acknowledged, Purchaser agrees to buy, and Seller agrees to sell, subject to ground leases and parking agreements, as hereinafter described, Seller's interest in those certain medical office buildings located at 3333 Old Milton Parkway, Alpharetta, Georgia, including all personal property, equipment and intangibles (including building permits and similar property) located therein (collectively, the **"Improvements"**), located on the land being more particularly described on **Exhibit A** attached hereto and made a part hereof (the "**Land**"), the purchase and sale being on the terms and conditions hereinafter set forth.  Seller and Purchaser acknowledge and agree that Seller is not selling to Purchaser, and Purchaser is not acquiring from Seller, the Land, but only the Improvements located on the Land.   At Closing, Purchaser will ground lease the Land (among other interests) pursuant to (1) certain ground lease agreement (the "**Ground Lease**") demising tracts of real property located at 3333 Old Milton Parkway, Alpharetta, Georgia effective as of the 31st day of August, 2017, by and between 3333 OLD MILTON ALPHARETTA LLC, a Delaware limited liability company ("**Original Ground Lessor**") and 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company ("**Ground Lessee)**, as amended by that certain First Amendment to Ground Lease Agreement dated as of August 28, 2019 (the "First Amendment") (the Original Ground Lease Agreement together with the First Amendment, collectively, the "Ground Lease Agreement") with respect to that certain Land, as described on Exhibit B-1 of the Ground Lease Agreement, annexed hereto as "Exhibit "A" and for purposes of this Agreement, the "Land" and "Improvements" shall sometimes be collectively referred to as the "**Property.**"

1.00    **PURCHASE PRICE AND METHOD OF PAYMENT**:    The purchase price ("**Purchase Price**") for the Property is **THIRTY NINE MILLION, FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($39,500,000.00).**    Purchaser shall pay the Purchase Price to Seller in cash at Closing, as that term is hereinafter defined in Section 5.00, or by wire transfer deposited at Closing to the account designated by Seller.

2.00    **EARNEST MONEY:**  Purchaser has delivered to Escrow Agent, simultaneously with the execution of this Agreement, the sum of **TWENTY FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00)** ("**Earnest Money**") by check, receipt of the check being hereby acknowledged by Escrow Agent (as hereinafter defined), as Earnest Money which is to be applied as part payment of the Purchase Price at the time the sale is consummated, or otherwise distributed as herein provided.  Escrow Agent shall deliver the Earnest Money to Seller at Closing to apply to the Purchase Price and otherwise shall hold and disburse the Earnest Money pursuant to the Escrow Agreement, a copy of which is attached hereto as **Exhibit B** and made a part hereof.  The Earnest Money shall be non-refundable to Purchaser except in the event of termination of this Agreement by reason of (i) a default by Seller, (ii) Purchaser's termination right under Section 4.00 hereof, (iii) a Major Condemnation (as defined in Section 14.00 hereof), or (iv) a Major Casualty (as defined in Section 8.00 hereof).

3.00    **TITLE**:  It shall be Purchaser's responsibility at Purchaser's sole cost and expense to obtain (i) a commitment for title insurance on the Improvements and on the leasehold interest of Purchaser in the Land and other interests conveyed to Purchaser under the Ground Lease ("**Title Commitment**"), together with copies of all items shown as exceptions to title therein, issued by a title insurance company selected by Purchaser ("**Title Company**"), (ii) an owner's and mortgagee's title insurance policy, with any endorsements, as issued by the Title Company, and (iii) a current plat of survey of the Property and leasehold interests conveyed to Purchaser under the Ground Lease prepared by a surveyor selected by Purchaser and approved by Seller in writing ("**Survey**").  The Survey shall indicate the total number of acres in the Land to the nearest one-thousandth of an acre, and shall reflect all Improvements on the Land.  Surveyor shall certify to both Purchaser and Seller on the plat of Survey the acreage in the Land and in the Other Property Interests and other matters on the Survey.  Purchaser shall deliver two (2) copies of the Survey to Seller within five (5) days from and after Purchaser's receipt of the Survey from the surveyor.  In the event Seller disagrees with any aspect of the properties or improvements as shown on the plat of Survey, Seller shall have the right, at Sellers' expense, to have a new survey prepared.  In the event Purchaser does not accept Seller's survey, Purchaser's and Seller's surveyors shall name a third surveyor to survey the Property and the afore-described matters and interests, the cost to be divided equally between Seller and Purchaser.  Purchaser shall have until the expiration of the Inspection Period to provide written notice to Seller of any matters shown by the Title Commitment or Survey which are not satisfactory to Purchaser, or in lieu thereof, to provide written notice that there are no matters which are not satisfactory to Purchaser, which notice ("**Title Notice**") must specify the reason any matter(s) are not satisfactory and the curative steps necessary to remove the basis for Purchaser's disapproval.  If Purchaser fails to provide the Title Notice to Seller before the expiration of the Inspection Period, Purchaser shall be deemed to have waived any and all objections to title and survey matters.  The parties shall have until the expiration of ten (10) days from and after Seller's receipt of the Title Notice to make such arrangements or to take such steps as they shall mutually agree to satisfy Purchaser's objection(s); provided, however, that (i)

Seller shall have no obligation whatsoever to expend or agree to expend any funds, to undertake or agree to undertake any obligations or otherwise to cure or agree to cure any title or survey objections except as provided in Section 3.01, and (ii) Seller shall not be deemed to have any obligation to cure unless Seller expressly undertakes such an obligation by a written notice to or written agreement with Purchaser given or entered into on or prior to the end of the Inspection Period and which recites that it is in response to a Title Notice. Purchaser's sole right with respect to any Title Commitment or Survey matter to which it objects in a Title Notice given in a timely manner and which Seller does not expressly agree to cure as provided above or is not obligated to cure pursuant to Section 3.01, shall be to elect on or before the end of the Inspection Period to waive such objection or to terminate this Agreement except for Purchaser's Indemnity Obligations and other provisions of this Agreement which by their terms are to survive a termination of this Agreement. All matters of record affecting the Property and other interests conveyed under the Ground Lease; all unpaid ad valorem taxes; all matters shown in the Title Commitment and/or Survey or would be reflected by an accurate inspection or survey of the Property and other interests conveyed under the Ground Lease, and all matters with respect to which Purchaser fails to give a Title Notice on or before the last date for so doing, or with respect to which a timely Title Notice is given but Seller fails to undertake an express obligation to cure as provided above, shall be deemed to be approved by Purchaser as "**Permitted Encumbrances**."

3.01    Seller agrees not to encumber voluntarily the Property from and after the Effective Date. A lawsuit or judgment against Seller shall not be deemed a voluntary encumbrance. To the extent that Seller voluntarily encumbers the Property subsequently to the Effective Date, Seller shall cause such encumbrance to be removed on or before Closing. No third party shall be entitled to rely upon the obligation of Seller in the foregoing sentence. Purchaser shall have the right to amend its Title Notice at any time to reflect encumbrances affecting the title to the Property first being filed of record subsequently to the Effective Date, as that term is defined in Section 16.00. As to such encumbrances, Seller will notify Purchaser in writing, within the earlier of ten (10) days after receipt of Purchaser's notice or the date of Closing, if Seller agrees to cure such matters, it being understood and agreed that Seller shall have the right, but not the obligation, to remove such encumbrances. All such encumbrances which Seller does not agree to remove or is not required to remove by the terms of this Section shall be included within the term Permitted Encumbrances; provided, however, Purchaser shall not be obligated to close the transaction contemplated hereby if Purchaser does not approve any such additional encumbrances placed on the Property which are not removed by Closing.

3.02    Prior to the Closing, Purchaser shall not file with any applicable governmental authority any application for zoning or rezoning of the Property.

**4.00    INSPECTIONS:** Subject to the terms of this Agreement, prior to Closing, Purchaser, its engineers, surveyors, agents and representatives shall have the right to go on the Property

at reasonable hours to inspect and survey the Property and to conduct relevant studies for the development of the Property.    Purchaser shall hold Seller harmless from and indemnify Seller against any claims or damages claimed by any party resulting from such tests, inspections, surveys and studies and from any other access to the other properties reflected on the Survey.  Purchaser shall have sixty (60) days from the Effective Date (the "**Inspection Period**") in which to conduct tests, inspections, studies and make other determinations which, in the sole opinion of Purchaser, are necessary to determine the condition of the Property.    All tests, inspections, surveys and studies shall be at Purchaser's expense.  In addition, Purchaser shall have the right to conduct inspections and review of Property-related materials, including (i) all ground leases, parking agreements, easements, covenants, restrictions, subdivision plats, title and survey matters relating to the Property; (ii) all space leases of the Property; (iii) the accounts payable and other obligations relating to the Property; (iv) a copy of all existing title, engineering, survey, and environmental reports relating to the Property; and (v) all plans and specifications relating to the Property, including ground-lessor approved plans and specifications.  The items referred to in items (i) through (v), inclusive, shall be referred to herein as the **"Submission Items."**  Purchaser acknowledges and agrees that Seller has delivered to Purchaser all Submission Items in Seller's possession on or before no later than thirty days after the Effective Date hereof.  In addition to the Submission Items, Seller shall also provide Purchaser with customary due diligence information regarding the ownership and operation of the Property in Seller's possession as Purchaser may reasonably request in writing in connection with the transfer of the Improvements as provided herein.  Purchaser shall provide written reports to Seller during the Inspection Period, at thirty (30) days and forty five (45) days after the Effective Date, containing the status and progress of Purchaser's inspections and investigations of the Property, which reports shall include copies of any third-party reports commissioned and received by Purchaser during the Inspection Period.  If Purchaser determines as a result of its inspections and investigations of the Property that the Property is not suitable for its purposes, as determined by Purchaser in its sole discretion, Purchaser may terminate this Agreement by written notice to Seller as hereinafter provided in Section 13.00, given not later than the expiration of the Inspection Period, in which event this Agreement shall terminate except for Purchaser's Indemnity Obligations and other provisions of this Agreement which by their terms are to survive termination of this Agreement, and the Earnest Money shall be fully and promptly refunded to Purchaser.  Upon the expiration of the Inspection Period without Purchaser's having terminated this Agreement as provided in this Section 4.00, all Earnest Money deposited with Escrow Agent shall be non-refundable to Purchaser, except in the event of termination of this Agreement arising from (i) a default by Seller hereunder; (ii) a Major Condemnation; or (iii) a Major Casualty.

4.01    Purchaser shall not conduct or allow any physically intrusive testing of, on or under the Property without first obtaining Seller's written consent as to the timing and scope of work to be performed and, upon request of Seller, entering into an access agreement in a form acceptable to Seller.    Purchaser's breach of the

foregoing prohibition shall entitle Seller, at its option, immediately and without any cure period, to declare this Agreement to be terminated, except for Purchaser's Indemnity Obligations and other provisions of this Agreement which by their terms are to survive termination of this Agreement, and Escrow Agent shall deliver the Earnest Money to Seller as liquidated damages.

4.02    Purchaser agrees that, in making any non-intrusive physical or environmental inspections of the Property, Purchaser or Purchaser's agents will maintain not less than One Million and NO/100 Dollars ($1,000,000.00) comprehensive general liability insurance with contractual liability endorsement which insures Purchaser's Indemnity Obligations hereunder.  Purchaser will provide Seller with written evidence of the aforesaid insurance, will not reveal to any third party not approved by Seller the results of its inspections and will restore promptly any physical damage caused by the inspections.   Purchaser shall give Seller reasonable prior notice of its intention to conduct any inspections and Seller reserves the right to have a representative present.  In addition to Purchaser's obligation with respect to deliveries of reports as set forth in Section 4.00 hereof, Purchaser agrees to provide Seller with a copy of any inspection report upon Seller's written request therefor.  Purchaser agrees to indemnify, defend and hold Seller free and harmless from any loss, injury, damage, claim, lien, cost or expense, including attorneys' fees and costs, arising out of a breach of the foregoing agreements by Purchaser in connection with the inspection of the Property, or otherwise from the exercise by Purchaser or its agents or representatives of the right of access to the Property as permitted by this Agreement (collectively,  "**Purchaser's Indemnity Obligations**").      The indemnity and other obligations of Purchaser under this Section 4.02 shall survive Closing or the termination of this Agreement.

4.03    With respect to the Submission Items submitted by Seller to Purchaser pursuant to Section 4.00 hereof, neither Seller, nor Seller's Broker (as defined in Section 16.00 hereof), nor any affiliate of Seller, nor any agent, officer or employee of Seller, of Seller's Broker or of any affiliate of Seller makes any representations or warranties as to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property including, without limitation, any of the Submission Items (e.g., that such materials are complete, accurate or the final version thereof, or that such materials are all that exist, or that such materials are all that are in the possession of Seller, Seller's Broker, any affiliate of Seller, or any agent, officer or employee of Seller, of Seller's Broker, or of any affiliate of Seller).  It is the parties' express understanding and agreement that such materials are provided only for Purchaser's convenience in making its own examination and determination as to whether it desires to purchase the Improvements, and, in doing so, Purchaser shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller, Seller's Broker, any affiliate of Seller, or any agent, officer or employee of Seller, of

Seller's Broker or of any affiliate of Seller. Purchaser expressly disclaims any intent to rely on any such materials provided to it by Seller, Seller's Broker, any affiliate of Seller, or any agent, officer or employee of Seller, of Seller's Broker or of any affiliate of Seller in connection with Purchaser's inspection, and Purchaser agrees that Purchaser shall rely solely on Purchaser's own independently developed or verified information. The foregoing shall survive Closing or termination of this Agreement.

**5.00    CLOSING**: Purchaser and Seller shall consummate and close the sale contemplated by this Agreement (the "**Closing**") on or before thirty (30) days after the expiration of the Inspection Period, or as soon thereafter as mutually agreed by Seller and Purchaser. Purchaser must provide Seller with at least five (5) business days' written notice of the Closing date prior to Closing. Closing shall take place at the offices of Escrow Agent or upon the time when Purchaser and Seller have delivered all documents and funds to Escrow Agent, and Escrow Agent has received all necessary approvals from all parties, and Purchaser and Seller, through their counsel have authorized Escrow Agent to close and disburse. In the event the last day for Closing is a non-business day, Closing shall be on the next Business Day. The term Business Day shall mean a day which Purchaser's lender is open for business.

5.01    At Closing hereunder, Seller shall convey its interest in the Improvements to Purchaser by a deed containing no warranties of title, subject to the Permitted Encumbrances, which deed shall be duly witnessed and attested for recording in Bexar County, Texas. Possession of the Improvements shall be granted to Purchaser at Closing subject to the Permitted Encumbrances.

5.02    At Closing, Purchaser and Seller shall execute and deliver (i) the Phase I and II Ground Lease, in form and content satisfactory to each of them, and (ii) the Ground Lease Assignment in form and content satisfactory to each of them.

5.03    At Closing, Purchaser and Seller shall execute and deliver an assignment and assumption agreement with respect to all tenant leases in the Improvements, and Purchaser shall receive a credit against the Purchase Price of all security deposits actually held by Seller as of the date of Closing.

5.04    At Closing, Purchaser shall assume all service contracts and equipment leases affecting the Property and Other Property Interests, and Purchaser and Seller shall execute and deliver an assignment and assumption agreement with respect to all service contracts and equipment leases affecting the Property and Other Property Interests.

5.05    At Closing, Seller shall execute and deliver to Purchaser a bill of sale with respect to all personal property set forth on **Exhibit C** attached hereto and made a part hereof without warranty, express or implied, including as to title, suitability, merchantability or fitness for a particular purpose or use.

5.06    At Closing, Purchaser and Seller shall pay any and all State of Texas property transfer or deed taxes on the Improvements as those items are customarily assigned to parties in the State of Texas.

5.07    Real estate taxes, ground rent and any unpaid assessments (to the extent not paid as part of additional rent under tenant leases), utility charges (to the extent not paid as part of additional rent under tenant leases), rents, service contract charges and equipment lease payments, and other income and expense items including common area medical campus expenses, pertaining to the ownership and operation of the Property and Other Property Interests shall be prorated at Closing as of Closing for the calendar year in which the sale is closed.

        (a)    With respect to the tax proration at Closing, if a tax proration required hereunder is not based on the actual tax bill for such year, the tax proration shall be based on the prior year's tax bill and adjusted when the actual tax bill is available.

        (b)    With respect to the proration of rent at Closing, Purchaser will receive a credit at Closing for the prorated amount of all rent paid to Seller and attributable to any period following the date of Closing.  **"Delinquent Rent"** (rent due prior to Closing, the payment for which has not been made on or before Closing) will not be prorated at Closing.  After Closing, the rent collected by Purchaser or Seller from tenants will be applied: first to Delinquent Rent and second to any accrued rent applicable to periods after Closing.  Purchaser will use reasonable efforts to pursue Delinquent Rent after Closing, and Seller retains the right to pursue tenants for Delinquent Rent.

5.08    Seller and Purchaser agree to comply with and to execute and deliver such certifications, affidavits and statements that are required at Closing in order to meet the requirements of Internal Revenue Code Section 1445 (Foreign/Non-Foreign Seller).

5.09    Purchaser shall deliver to Seller the written reaffirmation and re-certification described in Section 10.00.

5.10    Seller shall deliver to Purchaser at Closing a lien waiver and release from Seller's Broker (as defined in Section 15.00).  Purchaser shall deliver to Seller at Closing a lien waiver and release from all real estate agents and brokers employed by Purchaser or whose assistance or advice was used by Purchaser in negotiating this Agreement.

5.11    Seller shall deliver certified copies of the corporate resolution of Seller authorizing the transaction contemplated hereby, as well as an incumbency certificate for the individuals executing the closing documents on behalf of Seller.

5.12    Purchaser shall pay the cost of the title exam, the fee and leasehold owner's and mortgagee's title insurance commitments and policies, and any and all endorsements thereto, the cost of the Survey, and the amount of any and all recording fees for the deed, ground leases and any other documents pertaining to this transaction.

5.13    Purchaser and Seller shall each pay one-half of any escrow fees as may be charged by the Escrow Agent at Closing.

5.14    Purchaser and Seller shall each pay their respective legal fees and any other incidental expenses incurred in connection with the acquisition of the Property.

5.15    Seller and Purchaser acknowledge and agree that Seller shall terminate the existing Property Management Agreement in effect at the Property as of the date of Closing and that Seller shall not be responsible for any termination fees in connection with such termination.  Purchaser shall secure the agreement of its affiliated property management company under the Property Management Agreement in this regard.

6.00    **PURCHASER'S DEFAULT**:  If the transaction for the sale and purchase of the Property is not consummated because of default of Purchaser, the Earnest Money shall be paid to Seller as full liquidated damages for such default of Purchaser.  The parties hereto acknowledge (i) that it is impossible to estimate more precisely the damages to be suffered by Seller upon Purchaser's default, (ii) that the amount of the Earnest Money is a pre-estimate or best estimate of the probable loss or damages to Seller in the event of Purchaser's default, and (iii) that the Earnest Money is intended not as a penalty, but as full liquidated damages.  Seller hereby specifically waives any remedy of specific performance available to Seller by reason of Purchaser's default hereunder.

7.00    **SELLER'S DEFAULT**:  If the transaction for the sale and purchase of the Property is not consummated because of default by Seller and this Agreement is terminated by Purchaser, then the Earnest Money shall be returned to Purchaser upon demand and Purchaser shall, at Purchaser's sole option and as Purchaser's sole remedy: (a) terminate this Agreement by giving written notice of such termination because of default by Seller, whereupon all rights, duties and obligations of all parties hereunder shall expire except for Purchaser's Indemnity Obligations and other provisions of this Agreement which by their terms are to survive termination of this Agreement, or (b) seek specific performance of this Agreement.  Purchaser waives all right to seek damages.

8.00    **CASUALTY**:  If prior to Closing all or any material part of the Property or access to the Property is damaged or destroyed (a **"Major Casualty"**), then Purchaser , by written notice to Seller given within ten (10) business days of the date of the Major Casualty, or if earlier the date of Closing, may elect to terminate this Agreement, whereupon the Earnest Money shall be refunded promptly to Purchaser and this Agreement shall be terminated except for the indemnity and other provisions set forth in this Agreement

which by their terms are to survive. If Purchaser does not elect to terminate this Agreement following a Major Casualty within ten (10) business days from and after the date of the casualty, or if earlier the date of Closing, then this Agreement shall remain in full force and effect and the conveyance of the Property contemplated herein shall be effected and Seller shall assign to Purchaser at Closing the insurance proceeds to be received by Seller arising from such casualty, less any deductible, with no further adjustments between the parties.

**9.00** **"AS-IS" PURCHASE**: The Property is being sold in an **"AS-IS, WHERE-IS"** condition as of the date Seller executes this Agreement and as of Closing. Purchaser hereby agrees that it shall accept the Property and the Other Property Interests at Closing on an AS-IS basis and hereby waives any and all right to claim, either prior to or after Closing, that the sale of the Property is or was on any other basis. Except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or any affiliate of Seller, or by any partner, officer, person, firm, agent or representative acting or purporting to act on behalf of Seller or of any affiliate of Seller, including, without limitation, Seller's Broker, as to the condition or repair of the Property or the value, expense of operation, or income potential thereof, or as to any other fact or condition which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The parties agree that all understandings and agreements heretofore made between them or their respective agents or representatives are merged in this Agreement and the Exhibits hereto annexed, which alone fully and completely express their agreement, and that this Agreement has been entered into after full investigation, or with the parties satisfied with the opportunity afforded for investigation, neither party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Agreement or the Exhibits annexed hereto. Neither Seller nor any affiliate of Seller makes any representations or warranties as to whether the Property contains harmful or toxic substances or pertaining to the extent, location or nature of same. For purposes of the foregoing, knowledge does not include implied, constructive or imputed knowledge and is limited to the present and actual knowledge of Scott C. Honan on the date of the execution of this Agreement by Seller without Seller's or any Seller's affiliate's conducting any due diligence of the Property or any files. Further, for the purpose of the foregoing representation, the term hazardous substances shall include only those substances which Scott C. Honan has actual and present knowledge are (i) hazardous substances, (ii) located on the Property, and (iii) present in amounts or concentrations that (x) require reporting to a governmental authority, or (y) are in violation of any governmental law, rule, order or regulation. Further, to the extent that Seller, any affiliate of Seller, Seller's Broker, or any agent, officer or employee of Seller, of any affiliate of Seller, or of Seller's Broker has provided to Purchaser information or data from any inspection, engineering or environmental reports concerning harmful or toxic substances, neither Seller, nor any affiliate of Seller, nor Seller's Broker, nor any agent, officer or employee of Seller, of any affiliate of Seller or of Seller's Broker makes representations or warranties with respect to the accuracy or

completeness, methodology of preparation or otherwise concerning the contents of such reports. Purchaser acknowledges that Purchaser has sole responsibility to inspect fully the Property and investigate all matters relevant thereto, and Purchaser shall rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided to Purchaser by Seller, any affiliate of Seller, Seller's Broker, or any agent, officer or employee of Seller, of any affiliate of Seller or of Seller's Broker. Purchaser waives and releases Seller, Seller's affiliates, and all of the other officers, agents and employees of Seller and of Seller's affiliates from any present or future claims arising from or relating to the presence or alleged presence of harmful or toxic substances in, on, under or about the Property including, without limitation, any claims under or on account of (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as the same may have been or may be amended from time to time, and similar state statutes, and any regulations promulgated thereunder, (ii) any other federal, state or local law, ordinance, rule or regulations, now or hereafter in effect, that deals with or otherwise in any manner relates to, environmental matters of any kind, (iii) this Agreement or (iv) the common law. The terms and provisions of this paragraph shall survive Closing or any termination of this Agreement and shall be incorporated into any deed delivered by Seller.

10.00 **ASSIGNMENT**:  Purchaser represents unto Seller as of the Effective Date (i) that there are no parties having any right to acquire any legal, equitable or beneficial interest in Purchaser (ii) that there is no present negotiation or discussion for the sale, transfer or encumbrance of  Purchaser or the entity(ies) comprising Purchaser (iii) that there is no present negotiation or discussion for the sale or transfer of this Agreement or any interest therein; and (iv) that Purchaser is acting solely for itself and not for any undisclosed principal or in conjunction with any other party.  Purchaser warrants and represents unto Seller prior to Closing that, unless negotiating or entering into an agreement with a parent, subsidiary, or affiliated company of the Purchaser that is not or shall not be a Disqualified Party (as hereinafter defined), Purchaser shall not (i) make any assignment of this Agreement; (ii) permit any transfer or assignment of any interest in Purchaser; or (iii) negotiate or commit to sell any portion or all of the Property to any party or entity not approved by Seller.

11.00 **TIME**:  Time is of the essence of this Agreement.

12.00 **ENTIRE AGREEMENT**:  This Agreement is the entire agreement between Purchaser and Seller and there are no oral or other written agreements or representations directly or indirectly connected with this Agreement.  This Agreement shall be construed under the laws of the State of Texas.

13.00 **NOTICES**:  Any notice required or permitted to be given hereunder shall be deemed to be given when hand delivered or one (1) business day after pickup by Federal Express, or similar overnight express delivery service, or when delivered by facsimile transmission

with written acknowledgement of receipt, in any case addressed to the parties at their respective addresses referenced below:

| | |
|---|---|
| If to Seller: | 3333 Alpharetta Lifehope 10 Acre Land, LLC<br>11680 Great Oaks Way, Suite 120<br>Atlanta, Georgia 30322<br>Attn: Scott C. Honan<br>ScottH@richmondhonan.com |
| With a mandatory copy to: | Rountree Leitman Klein & Geer, LLC<br>Century Plaza I, 2987 Clairmont Rd., Ste. 350,<br>Atlanta, Georgia 30329<br>Attn: Will Geer<br>wgeer@rlkglaw.com |
| If to Purchaser: | 3333 Physicians Center MOB 1 SPE, LLC<br>11175 Cicero Drive,<br>Suite 100<br>Alpharetta, Georgia 30022<br>Attn: Brian McCoy |
| With a copy to: | Fox Rothschild LLP<br>999 Peachtree Street NE, Suite 1500<br>Atlanta, Georgia 30309<br>Attn: Tobin Watt |
| If to Escrow Agent: | PIEDMONT LAW GROUP of Garcia & Benkert LLC<br>100 Crescent Centre Parkway Suite 300<br>Tucker, Georgia 30084<br>Attn: Emma A. Benkert, Esq.<br>Phone No.: (404) 460-4466 |

**14.00  CONDEMNATION:**  Seller agrees to give written notice to Purchaser of any action, condemnation or proceeding pending or instituted for condemnation or other taking of all or any part of the Property by friendly or statutory proceeding for which Seller receives actual written notice.  If prior to Closing all or any material part of the Property or access to the Property is subject to a bona fide threat of condemnation by a body having the power of eminent domain or is taken by eminent domain or condemnation, or sale in lieu thereof (a "**Major Condemnation**"), then Purchaser, by written notice to Seller given

within ten (10) business days of the date of Seller's receipt of notice of such threat, condemnation or taking, or if earlier the date of Closing, may elect to terminate this Agreement, whereupon the Earnest Money shall be refunded promptly to Purchaser and this Agreement shall be terminated except for the indemnity and other provisions set forth in this Agreement which by their terms are to survive.  If Purchaser does not elect to terminate this Agreement following any notice of a Major Condemnation within said ten (10) business day period, or if earlier the date of Closing, then this Agreement shall remain in full force and effect and the conveyance of the Property contemplated herein, less an interest taken by eminent domain or condemnation, or sale in lieu thereof, shall be effected with no further adjustments.  At Closing, Seller shall assign, transfer, and set over to Purchaser all of Seller's right, title and interest in and to any awards that have been or that may thereafter be made for any such taking or sale in lieu thereof, and all such proceeds shall apply to the Purchase Price.  Seller agrees to allow Purchaser to cooperate in any negotiations for any condemnation or taking of the Property which might affect the intended use of the Property by Purchaser; provided, however, the final decision on any sale or condemnation shall be made by Seller.

**15.00  REAL ESTATE COMMISSIONS:**  Seller acknowledges and agrees that Seller has employed NO BROKERAGE SERVICES as a real estate agent or broker in connection with this Agreement and the transaction contemplated hereby.  Seller shall be responsible for all compensation payable to Seller's Broker.  Purchaser acknowledges and agrees, and represents and warrants to Seller, that Purchaser has employed no real estate agent or broker in connection with this Agreement or the Property, and has not negotiated this Agreement with the assistance of any real estate agent or broker.  The terms and conditions of this Section 15.00 shall survive the Closing or termination of this Agreement.  Seller and Purchaser shall indemnify and hold the other harmless from and against any and all claims of any other broker claiming a commission or finder's fee for this transaction.

**16.00  EFFECTIVE DATE:**  The Effective Date of this Agreement is the last date on which either Seller or Purchaser executes this Agreement.

**17.00  CONFIDENTIALITY:**  The terms and provisions of this Agreement are confidential.  Subject to all applicable laws, which govern the parties and their boards, including, without limitation, open records rules and laws, Seller and Purchaser agree not to release or publish, or permit the release or publishing of, any of the terms or content of this Agreement.  The foregoing shall not apply as to any suit or action for enforcement of the terms of this Agreement.

**18.00  RESERVED**

**19.00  ARBITRATION:**  Any controversy, claim or dispute between Seller and Purchaser arising out of or relating to the interpretation or enforcement of this Agreement, or any breach thereof, and any dispute concerning the scope of this arbitration clause, shall be settled by arbitration.

{File: 00156036.DOC / }

Any party to this Agreement may bring an action, including a summary or expedited proceeding, to compel arbitration of any controversy or claim to which this agreement applies in any court having jurisdiction over such action and the prevailing party shall be entitled to its attorneys' fees and costs.

Such arbitration proceeding shall be conducted in accordance with the Federal Arbitration Act and the then prevailing rules of the American Arbitration Association ("AAA") (or any successor organization). The decision of the arbitrators shall be final, binding and conclusive upon the parties and shall be non-appealable in the absence of a showing of fraud or lack of impartiality on the part of any arbitrator.

Notwithstanding anything to the contrary herein, nothing in this Section 19.00 shall limit the right of any party hereto to obtain provisional or ancillary remedies such as injunctive relief from a court having jurisdiction, before, during or after the pendency of any arbitration proceeding. The institution and maintenance of any action for such judicial relief, or the pursuit of provisional or ancillary remedies, shall not constitute a waiver of the right or obligation of any party to submit any claim or dispute to arbitration, including those claims or disputes arising from the exercise of any such judicial relief or pursuit of provisional or ancillary remedies, nor is the right to seek such relief from a court intended to limit the power of the arbitrators to grant any similar relief sought by either party. Judgment upon any arbitration award and the right to specific performance may be entered in any court having jurisdiction.

The arbitration shall be conducted in the City of Atlanta, Georgia and administered by the AAA (or any successor organization), which shall appoint a panel of three arbitrators, selected in accordance with its rules for commercial disputes. Each arbitrator shall be a qualified, impartial person who has not been affiliated in any way with either Seller or Purchaser and at lease one of the arbitrators, unless otherwise provided in this Agreement, shall be a lawyer with at least fifteen (15) years' experience in the metropolitan Atlanta, Georgia area. All arbitration hearings on the merits of the claims will be commenced within ninety (90) days of the demand for arbitration.

The party initiating an arbitration proceeding shall notify the other party in writing and shall describe in writing and in reasonable detail the nature of the dispute sought to be arbitrated, the amount, if any, of any claim, and the specific relief requested. The party responding to the claim shall reply in writing, within fifteen (15) days after receipt of the demand for arbitration, answering the claims set forth in the demand for arbitration including any affirmative defenses, and asserting any counterclaims, which such claims shall describe in reasonable detail the nature of the dispute relating to the counterclaim, state the amount, if any, of the counterclaim, and the specific relief requested.

The arbitrators are authorized to permit reasonable discovery by the parties including depositions, exchange of documents and interrogatories. The arbitrators shall schedule promptly all discovery and other procedural steps and otherwise shall assume case

management initiative and control to effect an efficient and expeditious resolution of the disputes at issue. The arbitrators are specifically authorized to render partial or full summary judgment by way of motions filed by any party.

Except as provided in this Section 19.00 with respect to attorneys' fees in connection with a motion to compel arbitration, each party shall be responsible for its own attorneys' fees irrespective of the outcome of any arbitration and no party shall be entitled to punitive damages irrespective of the claims sought to be arbitrated.

The arbitrators shall be required to follow the substantive law of Georgia in rendering their award in the same manner as would a judge if this matter were pending in a Georgia court, however neither the Georgia nor the federal rules of evidence shall apply.

**20.00   SPECIAL STIPULATIONS**. Notwithstanding any other provisions of this Agreement, the following special stipulations shall control:

1. Purchaser and Seller acknowledge and agree that the Property owned by Seller and contemplated to be purchased and sold pursuant to this agreement is currently the subject of that certain Chapter 11 Bankruptcy Case no. 22-57594 (the "BK Case")in the United States Bankruptcy Court, Western District of Texas (the "BK Court"), and this Agreement and the purchase and sale contemplated herein, is expressly subject to the approval of the BK Court. In the event that the BK Court does not approve of the sale of the Property pursuant to this Agreement or any other approved variation thereof, as subsequently agreed upon by all parties hereto, then this Agreement shall terminate and be considered null, void and of no further effect, and any Earnest Money deposited with Escrow Agent shall be returned to Purchaser, and the parties hereto shall have no further obligations under this Agreement.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the dates hereafter set forth by their duly authorized officers.

**PURCHASER**:

**3333 PHYSICIANS CENTER MOB 1 SPE, LLC**

By:  
Title:   **Member**  
Name:  **Brian McCoy**

{File: 00156036.DOC / }
14

**SELLER:**

**3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC**

By:_____

      Scott C. Honan, Authorized Representative

**ESCROW AGENT:**

**PIEDMONT LAW GROUP of Garcia & Benkert LLC.**

By:_____

Title:_____

Print Name:_____

**List of Exhibits to Purchase and Sale Agreement**

Exhibit A     -     Property Description
Exhibit B     -     Escrow Agreement
Exhibit C     -     List of Personal Property

## EXHIBIT A

### DESCRIPTION OF THE LAND

That certain real property located in the City of Alpharetta, County of Fulton, State of Georgia, described as follows:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOTS 907, 908 AND 911 OF THE 1ST DISTRICT, 2ND SECTION, FULTON COUNTY, GEORGIA, CITY OF ALPHARETTA AND BEING MORE PARTICULARLY DESCRIBED AS LOT 1 ON MINOR SUBDIVISION PLAT FOR SIEMENS REAL ESTATE, INC., PREPARED BY BATES-LONG AND ASSOCIATES UNDER SEAL AND CERTIFICATION OF FRED WILSON LONG, GEORGIA REGISTERED PROFESSIONAL LAND SURVEYOR NO. 1685, DATED DECEMBER 1, 2015, LAST REVISED MARCH 17, 2016, AND RECORDED IN PLAT BOOK 388, PAGE 98 OF THE REAL ESTATE RECORDS OF FULTON COUNTY, GEORGIA.

SAID TRACT CONTAINING 10.2101 ACRES OF LAND.

## EXHIBIT B

**ESCROW AGREEMENT**

[TO BE PROVIDED BY ESCROW AGENT]

**<u>EXHIBIT C</u>**

Schedule of Personal Property

# EXHIBIT D

## Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name:  **Phillip Miles**

Date:  12/16/2022

## EXHIBIT D

### Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name: **Andre White**

Date: 12/16/2022

{File: 00156036.DOC / }

**EXHIBIT D**

Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name: **Rob Windsor** _____

Date: ___12/16/2022___

## EXHIBIT D

### Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name: **David Hill** _____

Date: _____12/16/2022_____

## EXHIBIT D

## Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name: **Jeffrey Semel** _____

Date: _____12/16/2022_____

**EXHIBIT D**

Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name:  **Marlon Quinones**

Date:  12/16/2022

## EXHIBIT D

## Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name:  **Alan Einstein**_____

Date:  12/16/2022_____

## EXHIBIT D

### Expression of Interest to Own

There is a PURCHASE AND SALE AGREEMENT for the building known as 3333 Old Milton Parkway, Alpharetta, Georgia, the agreement is between 3333 ALPHARETTA LIFEHOPE 10 ACRE LAND, LLC, a Georgia limited liability company the Seller and 3333 PHYSICIANS CENTER MOB 1 SPE, LLC a Georgia limited liability company the Purchaser which Brian McCoy is the owner and manager of.

I am a tenant in the building and wants to express my interest in the participation of the ownership of 3333 Physicians Center MOB 1 SPE, LLC, subject to the consummation of the PURCHASE AND SALE AGREEMENT.

By: _____

Name: Kelly E. McCants MD

Date: 12/15/2022